UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MATTHEW J. KING,                    )
                                    )
          Plaintiff,                )
                                    )
    vs.                             )     Case No. 4:10-CV-02141-SPM
                                    )
WILLIAM BARTON, et al.              )
                                    )
          Defendants.               )

## MEMORANDUM OPINION

Plaintiff Matthew J. King ("Plaintiff") is a civilly committed resident of the Southeastern

Missouri Mental Health Center – Sex Offender Treatment Services facility ("SORTS"). Plaintiff

alleges that SORTS employees William Barton ("Barton") and Scott Jordan ("Jordan") violated

his constitutional rights by failing to protect him from two separate assaults by fellow resident

LuJuan Tucker ("Tucker") on October 17, 2010 and June 4, 2012. Barton and Jordan have filed

separate motions for summary judgment based on qualified immunity. The motions have been

fully briefed and are ready for disposition. The parties have consented to the jurisdiction of the

undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 84).

## FACTUAL BACKGROUND[1]

Defendant Barton was employed at SORTS from May 16, 2008 to November 2010, as a

unit program supervisor for Hoctor 4, a ward at SORTS. In that position, he was the facilitator

of the treatment team, he attended treatment team meetings, and he reviewed every violation

report for incidents that took place during his term.

---

[1] The background facts are presented in the light most favorable to Plaintiff, the nonmovant.

Defendant Jordan has been employed at SORTS as a unit manager at all times relevant to this action.  As a unit manager, Jordan supervised unit program supervisors, including Barton; helped to supervise residents; served on the risk management team; attended daily risk management meetings; reviewed incident reports and 24-hour reports; sometimes reviewed treatment progress notes; and exchanged information with unit program supervisors such as Barton.

Plaintiff arrived at SORTS on March 10, 2008, and was civilly committed there on June 13, 2008.  Upon his arrival, the risk management team noted that he "[l]ooks very young, [and] could be [a] victim of others due to [his] youthful look."

LuJuan Tucker became a resident of SORTS on March 10, 2008.  Between his arrival at SORTS and the September and October 2010 events giving rise to this lawsuit, Tucker had a history of threatening and assaulting SORTS residents and staff:  he assaulted a staff member in March 2008, a week after his arrival; he kneed a staff member in the forehead in April 2008; he approached a resident in the day hall in July 2008 and, without saying anything, punched the resident ten times in the head; after a nine-month absence from SORTS, he punched a resident in the face in July 2009, leaving him bleeding from the mouth and with a gash on his upper right eye;  he hit a resident on the side of the face in the restroom in November 2009 and, when confronted by staff, threatened to do it again; he rubbed his crotch against the buttocks of a staff member in December 2009; he received a violation for direct threats after making a gun-like trigger-pulling gesture directed to another resident in December 2009; he was accused of forcing a resident to have sex with him three times in December 2009; he assaulted two different residents on one day in March 2010 after having threatened to "break someone's jaw" because of a new phone call policy; and he told residents and staff who began leaving for the dining hall

without him in June 2010, "I'll fuck one of you niggers up this morning.  I don't give a fuck who you is, female or male, I'll fuck you up."  These incidents were documented in incident reports, violation reports, and/or progress notes.  Consistent with the foregoing, Tucker had a reputation at SORTS for carrying out his threats and has never had a risk rating lower than "red" or "high risk" while at SORTS.

Plaintiff and Tucker resided on the same ward at SORTS from March 2008 to May 2008.  In May 2008, they had interaction in the recreation yard in which Plaintiff began to choke Tucker and Tucker punched Plaintiff.  At some point later, Tucker and Plaintiff were placed in different wards.  In November 2009, Plaintiff learned that Tucker was going to be transferred to his ward, Hoctor 4.  He told a staff member that he wanted to be moved to a different ward because he did not feel safe around Tucker, and Jordan was present for the conversation.  The staff member told Plaintiff that he should deal with his problems in group, and he was not granted a transfer.

On November 25, 2009, Tucker was transferred to Hoctor 4.  Plaintiff's and Tucker's rooms were as far apart from each other as was possible on the ward, and Plaintiff's room was in an area where Tucker was not permitted to go.

Plaintiff and Tucker did not speak to each other until Christmas 2009, when Plaintiff told Tucker that he did not want any trouble from him and that the past was in the past.  Beginning in January 2010, in an attempt to protect himself from harm, Plaintiff began an association with Tucker.  From January to August 2010, Plaintiff and Tucker interacted with each other on a daily basis for one to two hours, playing videogames or card games, and Barton observed these activities.  However, Plaintiff remained fearful of Tucker throughout this period of association.

### A. The October 2010 Assault

In mid-August, 2010, Plaintiff and Tucker had an argument about which television show to watch. Tucker told Plaintiff, "Fuck this shit, I'm watching BET; if you don't like it, you can punch me in my jaw." After that incident, Plaintiff and Tucker were no longer cordial with one another. Beginning in mid-August 2010 and continuing through October 2010, Tucker made threats and threatening gestures toward Plaintiff, including telling Plaintiff that he had killed a person before and was not afraid to kill again.

On September 8, 2010, Plaintiff made a team request to Barton requesting that he be moved away from Hoctor 4 to a "Blair" ward. In the request, Plaintiff stated that he was not permitted to make full use of his privileges in Hoctor 4, but that he would be able to do so in Blair. Plaintiff did not indicate that he wanted to move because he felt threatened by Tucker. The request was denied.

On September 9, 2010, Plaintiff notified SORTS nurse Paula Moyers that Tucker had become aggressive toward him. He told her that Tucker had threatened him, saying that he had killed a person before and was not afraid to kill again. Nurse Moyers informed Barton that Plaintiff wanted to be transferred off of Hoctor 4 because he felt threatened by Tucker due to statements that Tucker had made to him, though Nurse Moyers did not specify to Barton what types of threats Tucker had made to Plaintiff. Barton asked Nurse Moyers to watch Plaintiff and Tucker and document their behavior. Barton also reported to Jordan what Nurse Moyers had told him, and Jordan directed Barton to take no action other than what had already been set in motion by Barton. Jordan did not recommend that Plaintiff be transferred to a different ward. The treatment team, including Barton, recommended that Plaintiff not be transferred out of

Hoctor 4. In addition to Nurse Moyers, Plaintiff told at least five other members of the ward staff about his fear of Mr. Tucker.

Plaintiff testified that on September 10, 2010, he filed another treatment team request asking to be moved to a different ward due to his fear of being attacked by Tucker, and that Barton denied the request.[2]

In the remaining weeks of September 2010, there were several incidents involving threatening or violent behavior by Tucker. On September 13, 2010, the risk management team documented that there was a "rumor Tucker may start a 'rumble' on [Hoctor 4]," and Barton was assigned to monitor the situation. On September 19, 2010, Tucker assaulted a resident, striking him twice on the side of the head and face and knocking his glasses and hearing aid to the ground; the assault was documented in a violation report, an incident report, and Tucker's progress notes, and Barton was assigned to deal with the situation. On September 20, 2010, Tucker punched a resident in the mouth; the assault was documented in a violation report and Tucker's progress notes. On or about September 20, 2010 to September 23, 2010, Plaintiff reported at his Bi-weekly Core Process Group that Tucker had threatened to "beat [his] ass" if Plaintiff got in "his way"; Plaintiff's report is documented in his Bi-weekly Core Process Group Progress Notes, though the notes do not identify the resident. On September 22, 2010, the risk management team documented that Tucker was showing a pattern of aggressive behavior and that Tucker had indicated that as long as he had already gotten one violation, he might as well get other violations to "settle scores." On September 24, 2010, a resident reported that he had been threatened and sexually harassed by Tucker; the incident report describing the threats noted that Tucker's behavior on the ward suggested a valid concern, and that Tucker should be

_____

[2] This request was not produced in discovery, and Barton asserts that it does not exist.

monitored as a risk issue.  On September 27, 2010, a resident reported that he had been sexually harassed by Tucker and was in fear for his safety.  On September 28, 2010, the risk management team documented that Tucker may have been attacking other residents on behalf of another resident.  The note identified Plaintiff as an "apparent target" of Tucker.

Around the end of September 2010, Plaintiff had an individualized treatment plan meeting at which Plaintiff told Barton that he was afraid of Tucker and explained the details, the gestures, and the verbal aggression that formed the basis for his fear.  Barton responded that Plaintiff should deal with his problem in group and that Barton would "look into it."  Plaintiff never heard back from Barton.  The treatment team, including Barton, recommended that Plaintiff not be transferred out of Hoctor 4.

On October 4, 2010, Tucker asked a security aide when he had committed his most recent violation.  After the aide responded that he had received a violation the previous week, Tucker remarked, "It's time for another one, I guess.  I [sic] fixen [sic] to whoop somebody."  This was documented in progress notes.

On October 17, 2010, Plaintiff was in the restroom washing his hands when Tucker entered the restroom.  Tucker attacked Plaintiff, hitting him in the face, injuring his nose and damaging his glasses.

### B.  The June 2012 Assault

On March 15, 2012, Tucker was transferred out of the SORTS facility into incarceration due to an allegation that he had raped another resident.  On April 26, 2012, Tucker was transferred back to SORTS following an allegation that he had raped a second person during his incarceration.  SORTS staff decided to house Tucker on Hoctor 5, where Plaintiff was then residing.  Several members of the SORTS staff met with Plaintiff regarding the transfer, and they

offered Plaintiff the option of moving to Hoctor 2, which was the only ward with beds available at the time. Plaintiff told staff that he wanted to remain on Hoctor 5 because he had been "jumped" in prison by one of the residents in Hoctor 2 and did not want to be around that individual. Dr. Brian Braumiller informed Plaintiff that if there were any issues later, there might not be beds available anywhere else for his transfer and that he would have to deal with his decision at that time. Plaintiff stated, "I own that decision. I'll stand by that and I'll work with you and I understand that it's all on me." Progress notes from April and May 2012 indicate that staff continued to monitor the situation, including encouraging Plaintiff to communicate with them if he felt unsafe.

On or about June 4, 2012, Tucker punched Plaintiff in the stomach. On June 5, Plaintiff was asked twice if he would feel safer if he was no longer on the same ward as Tucker; he refused to change wards because he did not want to move around in a shuffle and then move again. On June 6, 2012, Plaintiff was transferred to Blair 3 ward.

## PROCEDURAL HISTORY

On November 12, 2010, Plaintiff filed a Complaint against Jordan, Barton, and Nurse Moyers under 42 U.S.C. § 1983, asserting that they each failed to protect him from harm as required by the Fourteenth Amendment. (Doc. 1). On July 13, 2011, the court granted the defendants' motion to dismiss Plaintiff's claims, finding that Plaintiff had failed to allege facts sufficient to suggest that he had an official-capacity cause of action and that the defendants were entitled to qualified immunity on the individual-capacity claims because of a lack of allegations

raising an inference that Plaintiffs were deliberately indifferent to a substantial risk of serious harm.[3]  (Doc. 10).

Plaintiff appealed, and on February 15, 2012, the Eighth Circuit affirmed the dismissal of the individual-capacity claim against Nurse Moyers and the official-capacity claims against all three defendants, but it reversed the dismissal of the individual-capacity claims against Barton and Jordan.  *King v. Barton*, No. 11-2577, 455 F. App'x 709, 2012 WL 470153 (8th Cir. Feb. 15, 2012).   It found that Plaintiff had alleged facts sufficient to raise a plausible inference that Barton's and Jordan's failures to act had left Plaintiff at a substantial risk of serious harm, citing Plaintiff's allegations that Tucker had a violent history and a reputation for carrying out his threats, that Tucker had threatened Plaintiff numerous times; that Plaintiff had feared the threats enough to report them and to request a move; and that Tucker had assaulted Plaintiff.  *Id.* at 711. It also found that Plaintiff had alleged facts sufficient to raise a plausible inference that Barton and Jordan knew of the risk posed by Tucker but did not respond to it, citing Plaintiff's allegations that Barton knew about Tucker's threats and Plaintiff's safety concerns based on his conversation with Nurse Moyers and his denial of Plaintiff's move request, that Barton knew of Tucker's violent propensities through reputation and because he had found Tucker guilty of assaultive behavior violations; that Jordan knew Tucker had violent tendencies because Tucker had assaulted Plaintiff in the past; that Jordan knew that Tucker was threatening Plaintiff because he read daily reports that would have contained each threat Plaintiff reported; and that neither Barton nor Jordan did anything to prevent the assault.  *Id.*  The Eighth Circuit remanded the case for further proceedings.  *Id.*

---

[3] The Honorable Mary Ann L. Medler, United States Magistrate Judge, issued the opinion on Defendants' motion to dismiss.  Judge Medler retired in September 2012, and the case was reassigned to the undersigned United States Magistrate Judge.

On September 28, 2012, Plaintiff filed an Amended Complaint, asserting in Count I that Barton and Jordan violated Plaintiff's Fourteenth Amendment rights by failing to protect him from the October 2010 assault and asserting in Count II that Jordan violated Plaintiff's Fourteenth Amendment rights by failing to protect him from the June 2012 assault. (Doc. 89).

On March 25, 2013, Defendants Barton and Jordan filed the instant motions for summary judgment, in which they argue that they are entitled to qualified immunity on the individual-capacity claims against them. (Docs 118, 119).

## LEGAL STANDARD FOR SUMMARY JUDGMENT

The court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing both the absence of a genuine issue of material fact and the entitlement to judgment as a matter of law. *Id.; Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings but must set forth specific facts showing that genuine issue of material fact exists for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256-57 (1986). If the evidence is such that a reasonable jury could return a verdict for the nonmoving party, summary judgment is not proper. *Id.* at 248.

In considering a motion for summary judgment, the court must view the facts in the light most favorable to the nonmovant, and all justifiable inferences are to be drawn in the nonmovant's favor. *Peebles v. Potter*, 354 F.3d 761, 765 (8th Cir. 2004).

## DISCUSSION

Both defendants argue that they are entitled to summary judgment on Plaintiff's Section 1983 claims based on the doctrine of qualified immunity. "Qualified immunity protects state

officials from civil liability for actions that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Shockency v. Ramsey County*, 493 F.3d 941 (8th Cir. 2007) (citation omitted). Evaluating an assertion of qualified immunity involves a two-step inquiry in which the court determines "(1) whether the facts alleged or shown, construed in the light most favorable to [the plaintiff], establish a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged misconduct, such that a reasonable official would have known that her actions were unlawful." *McCaster v. Clausen*, 684 F.3d 740, 746 (8th Cir. 2012) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Unless the answer to both of those questions is yes, the defendant is entitled to qualified immunity. *Id.* However, "[i]f there is a genuine dispute concerning predicate facts material to the qualified immunity issue, the defendant is not entitled to summary judgment." *White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008).

The Court will evaluate separately whether Defendants are entitled to qualified immunity as to each count of Plaintiff's Amended Complaint.

## I. COUNT I: THE OCTOBER 2010 ASSAULT

In Count I, Plaintiff asserts that Defendants Jordan and Barton failed to protect him from Tucker in the weeks leading up to Tucker's assault of Plaintiff on October 17, 2010.

### A. Whether the Facts Shown With Respect to Count I Establish a Violation of a Constitutional Right

It is well established that the Eighth Amendment "requires prison officials to 'take reasonable measures to guarantee' inmate safety by protecting them from attacks by other prisoners." *Young v. Selk*, 508 F.3d 868, 871 (8th Cir. 2007) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Although the Eighth Amendment applies directly only to convicted prisoners, the Fourteenth Amendment provides civilly committed individuals and other detainees

"at least the same level of constitutional protection as the Eighth Amendment." *Nelson v. Shuffman*, 603 F.3d 439, 446 n.3 (8th Cir 2010) (considering failure-to-protect claims brought by a detainee living in a sex offender treatment center under the standards applicable to prisoners' failure-to-protect claims); *see also Youngberg v. Romeo*, 457 U.S. 307, 315-16, 102 S. Ct. 2452 (1982).

In order to establish a failure-to-protect claim under the Eighth or the Fourteenth Amendment, a prisoner or detainee must demonstrate that the defendant officer was "deliberately indifferent to a 'substantial risk of serious harm.'" *Young*, 508 F.3d at 872 (quoting *Farmer,* 511 U.S. at 828); *see also Nelson*, 603 F.3d at 446. This requires a plaintiff to make a two-part showing. First, the plaintiff must show that, "viewed objectively, the deprivation of rights was sufficiently serious," which requires establishing that "'the official's failure to protect resulted in the inmate being incarcerated under conditions posing a substantial risk of serious harm.'" *Nelson*, 603 F.3d at 446 (quoting *Young*, 508 F.3d at 872). An assault by one inmate against another constitutes "serious harm." *Jensen v. Clarke*, 94 F.3d 1191, 1198 (8th Cir. 1996); *see also King*, 455 F. App'x at 711. Second, the plaintiff must show that the defendant officials were "deliberately indifferent"—that is, that they "actually kn[ew] of the substantial risk and fail[ed] to respond reasonably to it." *Nelson*, 603 F.3d at 446 (quotation marks omitted).

### 1. *Objective, Substantial Risk of Serious Harm*

In assessing the whether the evidence supports a finding that Plaintiff was subject to an objective, substantial risk of serious harm, the Court finds two cases particularly instructive: *Young v. Selk*, 508 F.3d 868 (8th Cir. 2007), and *Nelson v. Shuffman*, 603 F.3d 439 (8th Cir. 2010).

In *Young*, shortly after the plaintiff moved into a cell with a new cellmate, the plaintiff requested that the cellmate keep the television volume down, and the cellmate responded by shouting, "You don't tell me what to do or anything else"; cursing at the plaintiff; and telling the plaintiff that if he had a problem, the plaintiff would have to deal with the cellmate and his "boys." *Id.* at 870. The plaintiff reported the threat to one official that day and requested to be moved from the room immediately, and he repeated the report to a second official the next day. *Id.* at 870-71. Later on the day of the second report, the cellmate and two other inmates attacked the plaintiff in his cell. *Id.* The Eighth Circuit found sufficient evidence of a substantial risk of serious harm to preclude summary judgment based on qualified immunity. *Id.* at 872-83. It stated that the cellmate's conduct was "the most probative evidence of the degree and type of risk that [the plaintiff] faced" and found that the assailant's conduct toward the plaintiff, by itself, raised a reasonable inference of a substantial threat of violence against the plaintiff. *Id.* at 872. The court stated that the record "support[ed] an inference that [the cellmate] was a dangerous man who was particularly volatile, that he was easily offended and enraged, and that he was willing to attack . . . when in a state of rage." *Id.* at 873. The court also noted that the fact that plaintiff had promptly reported the threat and then repeated it the next day strengthened the inference of a substantial risk of serious harm to the plaintiff. *Id*. at 872-73.

In *Nelson*, the plaintiff's assailant was a resident of the Missouri Sexual Offender Treatment Center who had a long history of violent and threatening behavior, including sexual misconduct, physically threatening behavior, sexual advances toward other residents, an assault on another resident, and threats of physically and sexually assault against residents and staff. *Id.* at 443. He also spent significant time in protective isolation or physical restraints. *Id.* at 443-44. After the assailant was released from protective isolation, the plaintiff was assigned to share a

room with him. *Id.* at 444. Less than a day later, the assailant sexually assaulted the plaintiff. *Id.* In denying the defendants' motion for summary judgment based on qualified immunity, the Eighth Circuit found that it was "readily apparent that [the plaintiff] faced an objectively serious risk of harm by being placed in a room with [the assailant]." *Id.* at 447. The court emphasized the assailant's prior sexual assaults and demands for sex, his time spent in isolation or restraints, and the fact that the assailant had "subjected staff and residents to a relentless barrage of physical and sexual threats, assaultive and sexually explicit behavior, and related violent and aggressive misconduct." *Id.* at 447.

The present case shares significant characteristics with both *Young* and *Nelson*. As in *Young*, Tucker threatened Plaintiff with bodily harm on multiple occasions. On September 9, Plaintiff reported that Tucker made threatening statements to him, including a statement that Tucker had killed before and was not afraid to kill again. On September 20, Plaintiff reported that Tucker had threatened to "beat [his] ass" if Plaintiff got in "his way." Moreover, on September 28, the risk management team specifically identified Plaintiff as an "apparent target" of Tucker, which further suggests that Plaintiff was at risk. As in *Young*, the existence of this risk is strengthened by the evidence that Plaintiff reported his fear of Tucker (and the reasons for that fear) to multiple staff members on multiple occasions and requested to be moved due to that fear.

In addition, like the assailant in *Nelson*, Tucker had a history of violent behavior at SORTS and a reputation for carrying out his threats. Indeed, in the weeks leading up to the assault, there were numerous indications that Tucker was becoming increasingly aggressive and violent toward his fellow residents: between September 13 and October 17, 2010, the evidence suggests that Tucker committed two assaults, sexually harassed two residents (and threatened

one of them), was rumored to be starting a rumble on the ward, was documented to be showing a pattern of aggressive behavior and intending to "settle scores," and stated that he was "fixen [sic] to whoop somebody."

Barton attempts to distinguish *Young* and *Nelson* based on Plaintiff's history of friendship with Tucker. However, Plaintiff testified that he only formed an apparent friendship with Tucker to protect himself from Tucker given their prior history, and he claims that he remained fearful of Tucker throughout the period of apparent friendship. Moreover, whatever friendship may have existed until August 2010, it had clearly ended by September 2010, when Tucker was making threatening comments and gestures to Plaintiff, Plaintiff was reporting to staff members that he was afraid of Tucker, and the risk management team was describing Plaintiff as an "apparent target" of Tucker.

Jordan argues that Plaintiff was shielded from harm because Plaintiff's room was as far away from Tucker's as was possible on the ward, because Tucker was housed near the nurses' station where he could be constantly monitored, and because Tucker was not permitted to access the hallway where Plaintiff's room was located. The Court acknowledges that because Plaintiff and Tucker were not roommates, the level of risk to Plaintiff was likely not as high as in *Young* and *Nelson*. However, the record indicates that Tucker had assaulted residents in common areas on multiple prior occasions and that Tucker frequently interacted with Plaintiff in common areas. Moreover, Plaintiff's testimony that he was assaulted by Tucker in the restroom and then went to the nurses' station to report the assault contradicts Jordan's assertion that Tucker was "constantly monitored." Viewing the record in the light most favorable to Plaintiff, it does not appear that the separation between Tucker's and Plaintiff's rooms established a lack of substantial risk of serious harm.

In sum, viewing the record in the light most favorable to Plaintiff, and drawing all reasonable inferences in Plaintiff's favor, Plaintiff has produced evidence sufficient to support a finding that there is at least a genuine issue of material fact as to whether there was an objective, substantial risk of serious harm to him at the time of the October 17, 2010, assault.

### 2. *Deliberate Indifference*

Under the second prong of the failure to protect analysis, the Court must consider whether the defendant officials were deliberately indifferent to the substantial risk of serious harm. "'An official is deliberately indifferent . . . if he or she actually knows of the substantial risk and fails to respond reasonably to it.'" *Nelson*, 603 F.3d at 446 (quoting *Young*, 508 F.3d at 873); *see also Farmer*, 511 U.S. at 834. The standard requires a "culpable state of mind . . . more blameworthy than negligence." *Farmer*, 511 U.S. at 834-35 (citation omitted). To be deliberately indifferent, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "The question of whether the official knew of the substantial risk is a factual one subject to demonstration in the usual ways, including inference from circumstantial evidence.'" *Nelson*, 603 F.3d at 447 (quoting *Young*, 508 F.3d at 872); *see also Farmer*, 511 U.S. at 842.

Again, the Court finds *Young* and *Nelson* instructive. In *Young*, the plaintiff testified that he told two officials that his new cellmate had threatened him, that his circumstances were urgent, that he needed to be moved immediately, and that it was an emergency. 508 F.3d at 873. In addition, he told one of the officials that the cellmate was "deranged," and another inmate told the same official that there was "something wrong" with the cellmate. *Id.* at 873-74. The officials' only response was to suggest that Plaintiff file a "kite" (a prison complaint form) that

would take multiple days to be processed.  *Id.* at 874.  The Eighth Circuit held that this provided sufficient evidence to establish for purposes of summary judgment that the officials were aware of a substantial risk of serious harm to the plaintiff and that their response to it—suggesting a solution that would take days to have any effect—was unreasonable.  508 F.3d at 873-74.

In *Nelson*, the Eighth Circuit found that an assailant's long history of very violent behavior was sufficient to show the defendant officials' awareness of the threat he posed to a potential roommate.  It stated:

> [The assailant] had a history of sexually assaulting vulnerable young males, and his conduct after arriving at the Treatment Center can be described as violent, aggressive, assaultive, and out of control.  Through their various capacities at the Treatment Center, each of the seven defendants were fully aware of [the assailant's] past predatory behavior, and the nature and sheer quantity of sexual and physical misconduct exhibited at the Treatment Center.  [The assailant] was a perpetual source of fear and frustration for staff and a constant subject of disciplinary actions, e.g., isolation and physical restraints, necessary to protect staff and residents.

*Nelson*, 603 F.3d at 447.

The Court will consider in turn each defendant's knowledge of, and response to, the risk posed to Plaintiff by Tucker.

### a.  *Barton*

The record here contains evidence suggesting that Barton was aware that Tucker posed a substantial risk of serious harm to Plaintiff.  First, like the officials in *Nelson*, Barton was aware of Tucker's history of assaults against residents other than Plaintiff, and he admits that Tucker had a reputation for carrying out his threats.  Second, Barton was aware that, in September 2010, Tucker was displaying particularly aggressive behavior: Barton was assigned on September 13 to monitor a situation involving rumors that Tucker might start a "rumble" on the ward; he was assigned to deal with a September 19 incident in which Tucker assaulted a resident; and he

reviewed a violation report documenting a September 20 incident in which Tucker assaulted a resident. Third, and most important, around the time of this increasingly aggressive behavior, Barton was informed on two occasions that Tucker was threatening Plaintiff: first on or around September 9, 2010, when Nurse Moyers relayed to Barton Plaintiff's statements that he had received threats from Tucker and felt unsafe on the ward, and again at the end of September, when Plaintiff told Barton directly that he was afraid of Tucker and explained to Barton the details, gestures, and verbal aggression that formed the basis for his fear.

Barton argues that there was no evidence to back up Plaintiff's allegations of threats, because neither Barton nor other staff members ever observed Tucker threatening Plaintiff or engaging in behavior suggesting that he had threatened Plaintiff. However, a plaintiff need not show that officials observed threatening behavior in order to establish that the officials knew of a substantial risk of serious harm. *See Young*, 408 F.3d at 873-74 (finding sufficient evidence that the defendants actually knew of a substantial risk of serious harm based solely on the plaintiff's reports of the assailant's threats).

Barton also emphasizes that because he had observed Plaintiff and Tucker playing games and joking with each other, he had "absolutely no evidence that there was any animosity between [them]." (Doc. 118, p. 13). That may have been true prior to September 2010; however, by the end of September 2010, Barton did have such evidence: Barton had received two separate reports that Tucker was threatening Plaintiff and that Plaintiff felt unsafe, including details about the statements and gestures Tucker had made that formed the basis for Plaintiff's fear. Moreover, there is no evidence that Barton observed Plaintiff and Tucker interacting in a friendly way after August 2010.

Barton further argues, citing *Prater v. Dahm*, 89 F.3d 538, 542 (8th Cir. 1996), that the fact that over a month passed between Plaintiff's first report of threats on September 9, 2010, and the attack on October 17, 2010 suggested to Barton that Tucker would not carry out his threats. In *Prater*, the assailant threatened the plaintiff, and the plaintiff reported the threat to prison officials. *Id.* at 540. An official spoke with the assailant, and the assailant assured the official there would be no more problems between the two inmates. *Id.* After about a month, the assailant was temporarily transferred to another facility and returned two weeks later. *Id.* Two weeks after his return, he attacked Plaintiff. *Id.* The court found that the plaintiff's allegations were insufficient to establish that the prison officials actually knew of a substantial risk to the plaintiff, emphasizing that "threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm"; that "prison officials had assurances from both inmates that there would be no trouble"; and that "despite the threats, [the two inmates] were incarcerated together for a substantial period of time without incident." *Id.* at 541-42. The Court finds *Prater* inapposite. Here, Barton received no assurances from either Plaintiff or Tucker that there would be no problems between them. Moreover, in contrast to *Prater,* in which two months passed "without incident" between the threat and the assault, here Barton was aware of several relevant incidents that occurred during the period between Plaintiff's first report of threats on September 9 and the assault, including Plaintiff's renewed report of the threats at the end of September, the rumor that Tucker would be starting a "rumble" on the ward, and Tucker's assaults of two other residents.

In sum, the Court finds that Plaintiff's reports of Tucker's threatening behavior toward him, in combination with Barton's knowledge of Tucker's recent history of aggressive and violent behavior, is sufficient to create a genuine issue of material fact regarding whether Barton

actually knew that Tucker posed a substantial risk of serious harm to Plaintiff. *See Young*, 508 F.3d at 873-74 (finding that a plaintiff's testimony that he informed prison officials about a cellmate's threatening statements was sufficient to support a finding that the officials were aware of a substantial risk of serious harm to the plaintiff); *Nelson*, 603 F.3d at 447-48 (finding that the defendants' awareness of the assailant's extensive history of predatory and assaultive behavior, as well as the fact that the assailant had been subject to several prior disciplinary actions necessary to protect staff and residents, was sufficient to establish the officials' knowledge of a substantial risk of serious harm to a potential roommate).

In addition, the Court finds that a genuine issue of material fact exists regarding whether Barton's response to the risk posed by Tucker was reasonable. Barton argues that he took reasonable steps to respond to the situation because after Nurse Moyers alerted him to Plaintiff's concerns on September 9, Barton asked staff to monitor the situation and to document Plaintiff's and Tucker's behavior. Barton's response on September 9 may have been reasonable, given the information available to him at that time. However, by the end of September, Barton had additional information supporting the existence and credibility of the threats to Plaintiff, including a new report from Plaintiff explaining his fear and the reasons for it and additional information regarding Tucker's aggressive and violent conduct. At that time, Barton's only response was to tell Plaintiff to discuss the problem in group therapy and to say that he would "look into it." There is no evidence that Barton "looked into it" or did anything else to respond to the risk existing to Plaintiff as of the end of September 2010. Viewed in the light most favorable to Plaintiff, there is sufficient evidence to support a finding that Barton's failure to act was unreasonable and constituted deliberate indifference to a substantial risk of serious harm. *See Young*, 508 F.3d at 874.

### b. *Jordan*

There is evidence in the record suggesting that Jordan knew there was a substantial risk of serious harm to Plaintiff from Tucker. First, as in *Young*, there is evidence that Jordan had been informed (by Barton) of Plaintiff's reports of threats from Plaintiff. Second, Jordan was a member of the risk management team, which documented in September 2010 that Tucker may have been attacking residents and that Plaintiff was an "apparent target." Third, as in *Nelson*, the evidence suggests that Jordan knew of Tucker's history of assaults and aggressive behavior. Jordan admitted that Tucker had a reputation for carrying out his threats. In addition, through Jordan's membership on the risk management team and his review of incident reports and other documentation, it can reasonably be inferred that he knew of much of Tucker's long history of violent and threatening behavior, including evidence indicating that Tucker planned in September 2010 to "settle scores" on the ward and that Tucker assaulted two residents in mid-September 2010.

Jordan emphasizes that Plaintiff never told him that he was threatened by Tucker, that his primary source of information regarding residents is documentation prepared by SORTS staff, that none of the reports he reviewed "documented that Plaintiff had any specific imminent fear of Tucker," and that the written reports contained no indication that Plaintiff wished to be moved to a different ward from Tucker due to a fear of Tucker. However, even if the written reports reviewed by Jordan do not specifically address Plaintiff's "fear," they do document that Plaintiff was recognized by staff to be "apparent target" of an individual who had a long history of violence and who was both threatening and committing acts of violence against his fellow residents during the relevant time frame. This is sufficient to create a genuine issue of material fact concerning whether Jordan knew of a substantial risk of serious harm to Plaintiff,

particularly when combined with evidence that Barton had told Jordan about Plaintiff's report of a threat from Tucker. *See Young*, 508 F.3d at 873; *Nelson*, 603 F.3d at 447-48.

The cases on which Jordan relies are inapposite. In *Prosser v. Ross*, 70 F.3d 1005 (8th Cir. 1995), one inmate (who was allegedly known to be dangerous) attacked another inmate in the cafeteria line, and the victim alleged that prison officials had failed to protect him from the attack. *Id.* at 1006-07. The court found that prison officials were entitled to summary judgment because the victim himself "admitted in his deposition that the attack took him by surprise," there was "no evidence that the two inmates harbored any hostile feelings toward one another," and the inmates "had never had so much as a disagreement." *Id.* at 1007. Here, in contrast, Jordan knew that Tucker had specifically threatened and targeted Plaintiff in the weeks leading up to the attack. The attack on Plaintiff was not analogous to the random act of violence discussed in *Prosser*.

In *Moore v. Briggs*, 381 F.3d 771 (8th Cir. 2004), also cited by Jordan, the court found no deliberate indifference for purposes of an alleged substantive due process claim where the record contained "no evidence of what [the defendants] knew," and it was undisputed that a number of measures had been taken to ensure that the assailant was properly supervised. *Id.* at 774-75. Here, in contrast, Plaintiff has produced evidence of what Jordan knew, and there is little evidence that Tucker was being adequately supervised, given that he had recently committed multiple assaults against fellow residents.

Jordan presents no evidence or argument that he responded in any way to the risk of harm posed to Plaintiff. He did not recommend that Plaintiff be transferred to another ward, as Plaintiff had requested, nor did he take any other action. Jordan argues that because he had no unilateral authority to transfer a resident to another ward, his failure to recommend a transfer

cannot support a constitutional claim. However, the law requires only that an official act reasonably, not that the official actually prevent the harm from occurring. *See Farmer,* 511 U.S. at 844 (stating that prison officials may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted). Jordan admits that he can make recommendations regarding resident transfers and that his recommendations are typically followed. Plaintiff has produced sufficient evidence to create a genuine issue of material fact regarding whether, by failing to recommend a transfer or to take some other action to protect Plaintiff, Jordan was deliberately indifferent to the substantial risk of serious harm posed to Plaintiff.

Based on the foregoing, the Court finds that facts shown by Plaintiff with respect to Count I could support a finding by a jury that there was a violation of Plaintiff's constitutional rights.

## B. Whether Plaintiff's Rights Were Clearly Established As of the Date of Defendants' Misconduct

Turning to the second prong of the qualified immunity inquiry, the Court considers whether the right Defendants allegedly violated was "clearly established" as of September 2010, when Plaintiff asserts that Defendants first violated his rights. "A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Mathers v. Wright,* 636 F.3d 396, 399 (8th Cir.2011) (internal quotation marks and citation omitted). The determination "is undertaken in light of the law as it existed at the time and the 'specific context of the case, not as a broad general proposition.'" *Young,* 508 F.3d at 875 (quoting *Saucier v. Katz,* 533 U.S. 194, 201 (2001)). However, a right may be clearly established even if there is no earlier case involving "fundamentally similar" or "materially similar" facts. *Hope v. Pelzer,* 536 U.S. 730, 741 (2002).

The "salient question . . . is whether the state of the law" gave the officials "fair warning that their alleged [conduct] was unconstitutional." *Id.*

Neither defendant provides any substantial argument regarding this aspect of qualified immunity. It was established well before 2010 that the Eighth Amendment requires prison officials to "protect prisoners from violence at the hands of other prisoners," and that an official violates that right if he acts with deliberate indifference—that is, "act[ing] or fail[ing] to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 833, 842 (1994) (internal quotation marks omitted). Moreover, it has long been established that under the Fourteenth Amendment, civilly committed individuals are entitled to at least the same level of protection as convicted criminals. *See Youngberg v. Romeo*, 457 U.S. 307, 315-16, 102 S. Ct. 2452 (1982) ("If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions."); *see also Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007) (holding that the Fourteenth Amendment's due process clause imposes a duty comparable to the Eighth Amendment's duty to protect inmates from assault by other inmates). Neither defendant disputes these basic principles.

Furthermore, the principal cases relied on here to find a constitutional violation, *Young v. Selk* and *Nelson v. Shuffman*, were decided before September 2010, the first date of Defendants' alleged misconduct. In *Young*, decided in 2007, the Eighth Circuit found that officials violated the plaintiff's clearly established Eighth Amendment rights when they failed to take action after the plaintiff reported threatening and aggressive statements from a cellmate and requested to be moved immediately. 508 F.3d at 872-75. In *Nelson*, decided in May 2010, the Eighth Circuit found that officials violated a detained sex offender's Fourteenth Amendment rights by placing

him in a room with an individual who had an extensive history of violent and assaultive behavior against fellow residents. 603 F.3d at 446-48. Although those cases are not factually identical to the present case, the Court finds that they gave the defendants "fair warning" that they would be violating a resident's constitutional rights when they failed to take any action in response to a resident's multiple reports that he was being threatened by an individual who had recently assaulted multiple fellow residents and who had a reputation for carrying out his threats.

In sum, Plaintiff has produced facts sufficient to show that, at a minimum, there is a genuine issue of material fact as to whether (1) both defendants violated his constitutional rights by failing to protect him in the weeks leading up to the October 2010 assault, and (2) those constitutional rights were clearly established at the time of Defendant's misconduct. Because there is a genuine dispute concerning predicate facts material to the qualified immunity issue, the Defendants here are not entitled to summary judgment. *White*, 519 F.3d at 813.

## II.    Count II: The June 2012 Assault

In Count II, Plaintiff claims that Jordan failed to protect him from harm in the April 2012 to June 4, 2012 time period by failing to act after it became apparent that Tucker would be placed in the same ward as Plaintiff. [4]   Plaintiff argues that his history with Tucker, combined with the fact that Tucker had been accused of raping fellow inmates or residents twice since the October 2010 assault, establish that Tucker posed a substantial risk of serious harm to Plaintiff and that Jordan was deliberately indifferent to that risk.

The Court assumes, without deciding, that Tucker posed an objective, substantial risk of serious harm to Plaintiff as of the April to June 2012 time frame and that Jordan was aware of that risk. However, the Court finds that Jordan is entitled to summary judgment because there is

---

[4] Barton was no longer employed by SORTS as of 2012, so Count II is brought only against Jordan.

no evidence that he was deliberately indifferent to that risk. As discussed above, "'An official is deliberately indifferent . . . if he or she actually knows of the substantial risk and fails to respond reasonably to it.'" *Nelson*, 603 F.3d at 446 (quoting *Young*, 508 F.3d at 873); *see also Farmer*, 511 U.S. at 834. Accused officials must possess a "sufficiently culpable state of mind . . . more blameworthy than negligence" which must constitute "more than ordinary lack of due care for the prisoner's interests or safety." *Farmer*, 511 U.S. at 834-35 (citation omitted).

Even viewed in the light most favorable to Plaintiff, the facts here are simply inadequate to permit a jury to conclude that Jordan was deliberately indifferent to a known risk to Plaintiff in 2012. The documentation available to Jordan in 2012 showed that multiple ward staff members were taking active and reasonable steps to protect Plaintiff from the possible risk posed by Tucker's transfer into Hoctor 5. First, staff offered Plaintiff a transfer to the only other ward with available beds, and then (when Plaintiff refused that transfer) staff continued to monitor the situation and encouraged Plaintiff to inform them if he felt unsafe. It is unclear what action Jordan should have taken at this point, particularly given that it is undisputed that Plaintiff himself was declaring that he "owned [the] decision" to remain on Hoctor 5 in 2012. In addition, there is no evidence that Plaintiff changed his mind about his decision to stay on Hoctor 5 after those initial conversations, nor is there any evidence that he received any threats or had any conflicts with Tucker in the time between the October 2010 assault and the June 4, 2012 assault.

Progress notes do indicate that Plaintiff did not want to move to Hoctor 2 at least in part because he had previously been "jumped" by another Hoctor 2 patient while in prison and he did not want to be around that individual. However, the "jumping" incident would have occurred at least four years earlier,[5] and there is no other evidence in the progress notes or elsewhere that

---

[5] The "jumping" incident occurred in prison, and Plaintiff had been at SORTS since March 2008.

would have put Jordan on notice that Plaintiff would have been unsafe on Hoctor 2. In view of Jordan's knowledge that the ward staff was actively monitoring the situation, Plaintiff's insistence that he wanted to remain on Hoctor 5, and the undisputed fact that there were no beds available on other wards, the Court finds no evidence that Jordan had a "sufficiently culpable state of mind" to support a finding of deliberate indifference or that he responded unreasonably to the situation. Thus, Plaintiff has failed to produce facts that establish a violation of a constitutional right with respect to Count II, and Jordan is entitled to qualified immunity on that count. *See Farmer*, 511 U.S. at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.").

## CONCLUSION

With respect to Count I, the Court finds that Plaintiff has produced sufficient evidence to create a genuine issue of material fact regarding whether his Fourteenth Amendment rights were violated. Moreover, the Court finds that those rights were clearly established as of the date of the alleged violation. Thus, Defendants are not entitled to summary judgment on qualified immunity grounds on Count I.

With respect to Count II, however, the Court finds that Jordan has established that there are no genuine issues of material fact as to whether he violated Plaintiff's constitutional rights, and that he is entitled to judgment as a matter of law. Thus, he is entitled to qualified immunity and to a grant of summary judgment on Count II.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant William Barton's Motion for Summary Judgment (Doc. 118) is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant Scott Jordan's Motion for Summary Judgment (Doc. 119) is **DENIED** with respect to Count I of Plaintiff's Amended Complaint and **GRANTED** with respect to Count II of Plaintiff's Amended Complaint.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 8th day of October, 2013.